### In re MINNESOTA DISTILLERS, INC., Debtor.

**Bankruptcy No. 4–84–363.**

United States Bankruptcy Court, D. Minnesota.

Dec. 12, 1984.

James Baillie, John Koneck, Fredrickson & Byron, Minneapolis, Minn., for debtor.

Chris Elliott, Fabyanske, Svoboda & Westra, St. Paul, Minn., for respondent BarclaysAmerican/Business Credit, Inc.

### ORDER

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came on for hearing before the Honorable Margaret A. Mahoney, Judge of Bankruptcy Court, on November 2, 1984. Specifically, the Debtor objects to fees claimed by the secured creditor BarclaysAmerican/Business Credit, Inc. (Barclays), pursuant to 11 U.S.C. § 506(b). This Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 1334 and 157.

### FACTS

By its motion, the Debtor in this case raises an interesting and somewhat un-

---

usual objection to claimed attorneys fees and expenses incurred by Barclays. In fact, the Debtor concedes at the very outset that: (1) all claimed fees and expenses are within the scope of the loan agreement between the Debtor and Barclays;[1] (2) the reasonableness of the hourly rates charged by counsel for Barclays is not at issue; and (3) the efficiency and competency of counsel for Barclays is not at issue. Moreover, the Debtor does not appear to contest the reasonableness of the actual amounts of expenses incurred by Barclays. Instead, the Debtor's objection to Barclays' fees and expenses is grounded solely in the contention that certain actions taken on behalf of Barclays were unnecessary and unreasonable in light of Barclays' secured status.

To better understand the Debtor's objection in this case, a brief review of the relevant facts is in order.[2] On March 6, 1984, the Debtor filed its voluntary petition commencing this case under chapter 11 of the Bankruptcy Code. On that same day, the Debtor also filed a motion for use of cash collateral and moved for an expedited hearing on such motion. Two days later, on March 8, 1984, Barclays moved for modification of the automatic stay and similarly requested an expedited hearing. As a result of interim negotiations by the parties, the Debtor and Barclays reached agreement as to their respective motions, as evidenced by a stipulation filed three days later on March 12, 1984. The stipulation, as approved by the Court, provided in part for limited use of cash collateral by the Debtor as well as authorization to Barclays to advance funds from the Debtor's chapter 11 accounts to pay reasonable expenses and reasonable attorneys' fees. Pursuant to the stipulation and upon Court approval, the parties ultimately extended the April 13 termination date provided for in the stipulation to June 22, 1984, at which time a continued hearing for use of cash collateral, as well as a hearing upon Barclays' motion for modification of the automatic stay, was set to be heard.

On July 3, 1984, the District Court entered an order allowing further use of cash collateral and denying Barclays' motion to lift the automatic stay. In its order, the District Court held that Barclays was adequately protected in that the Debtor (1) was providing to Barclays monthly interest on the amount owed to Barclays, and (2) was keeping an equity cushion at all times

---

1. Paragraphs six and twenty-five of the parties' loan agreement governs Barclays rights to receive attorneys' fees and expenses in connection with the collection of the loan and protection of its collateral. Paragraph six provides in relevant part:

 All expenses of protecting, storing, warehousing, insuring, handling and shipping the Collateral ... so paid or incurred by [Barclays] for any of the foregoing and any and all other sums for which the debtor may become liable hereunder and all costs and expenses (including also attorneys' fees and court costs) which [Barclays] may incur in enforcing or protecting its lien on or rights and interests in the Collateral or any of its rights or remedies under this or any other agreement between the parties to or in respect of any of the transactions to be had thereunder, until paid by Debtor to [Barclays] with interest at the rate of aforesaid, shall be so much additional indebtedness owing by Debtor to [Barclays] hereunder and secured by all the said Collateral and the proceeds from the sale thereof and by any and all other Collateral, security, assets, reserves or funds of Debtor in or coming into the hands of [Barclays].

 Paragraph twenty-five provides in relevant part: Debtor will reimburse [Barclays] for all out-of-pocket expenses incurred by [Barclays] arising out of this transaction including without limitation, filing and recording fees, and reasonable attorneys' fees. [Barclays] is authorized to deduct and withhold from any amount due Debtor and/or to add to any amount due at any time, any and all costs, outlays, attorney's fees and expenses of every kind in character had or incurred in the enforcement of any of the provisions of this Agreement, and preparation for, negotiations regarding, consultations concerning or the defense of legal proceedings involving any claim or claims made or threatened against [Barclays] arising out of this transaction for the protection of the collateral securing loan or advances made hereunder.

2. This matter was heard on affidavits submitted by the Debtor and Barclays pursuant to Bankruptcy Rule 9017 which incorporates Federal Rule of Civil Procedure 43. Rule 43 provides in pertinent part: "When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties...." Fed.Rule Civ.P. 43(e).

of 10 percent of the accounts receivable and 35 percent of the inventory in which Barclays held a security interest. In inventory and accounts receivable alone, the District Court found that Barclays was oversecured in the amount of $366,691.89. Moreover, the District Court found that in Barclays' second secured position in the Debtor's real estate and equipment, Barclays had an interest in such collateral in the amount of approximately $300,000. The District Court's findings therefore indicate that for the purposes of that Order, Barclays was oversecured in the approximate amount of $666,691.89.

Subsequent to the cash collateral hearings, but prior to the District Court's July 3 Order, Barclays filed a motion to convert. Allen R. Meier, loan officer of Barclays, explains in an affidavit submitted on behalf of Barclays that the conversion motion was brought in light of the Debtor's intent to seek judicial authority to use cash collateral rather than entering into further stipulations. Ten days after the District Court's cash collateral order, on July 13, Barclays appealed that order.

In his affidavit, Mr. Meier indicates that Barclays had great difficulty in obtaining the requisite financial information and operating statements with which to monitor the operations of the Debtor and Barclays' collateral position. In light of the condition of the Debtor's books and records, Mr. Meier further indicates that it was beyond Barclays' expertise to determine whether the Debtor could, in fact, effect a successful reorganization. Apparently subsequent to the filing of its conversion motion, Barclays contacted International Finance Management Group, Inc., and requested that they prepare a management report on the operations of the Debtor. That report concluded that as to the viability of the Debtor's business and its prospect for continued operation under present conditions and capitalization, the Debtor has little chance to reverse the losses it has incurred in the past and to operate profitably in the future. The report listed as the primary reasons for its conclusion: (1) low gross profit margin on sales; (2) generally low volume of sales; (3) inadequate capitalization; (4) a negative net working capital position resulting in a need for the company to borrow a great deal of working capital; (5) a disadvantage in location as compared to major competitors; (6) a lack of reliable operating financial information; and (7) an operating position in the industry where only the narrowest of margins appear possible. The report explicitly did not take into account the possibility of the sale of the Debtor's assets and any relocation of the Debtor in the State of Iowa.

Mr. Meier further indicates that wildly disparate evaluations between the parties as to the value of real estate and equipment secured by Barclays prompted a need for expert appraisal of the properties. An evaluation of the equipment by Edward Bilbruck, Inc. yielded an appraised auction value of $214,125, and an appraised fair market value of $427,700. In contrast, the District Court's July 3 cash collateral order valued the Debtor's equipment at approximately $650,000. An evaluation of the real property by American Appraisal Associates yielded an appraised liquidation value of $400,000 and an appraised fair market value of $475,000. The District Court's July 3 cash collateral order valued the Debtor's real estate at approximately $710,000.

Terrence Clavin, president of the Debtor, submitted an affidavit wherein he criticizes the market report prepared by International Finance and Management Group, Inc. Specifically, Clavin indicates that the Debtor's inadequate capitalization, negative working capital position creating a borrowing need, and lack of reliable operating financial information were so obvious that both Barclays and Mr. Clavin already knew of them. Moreover, Mr. Clavin attacks the report as being prepared with little knowledge of the rectifying industry. For example, Mr. Clavin indicates that the Debtor's "generally low volume of sales" has recently been substantially higher than in past years when the Debtor operated successfully. He further indicates that the report's reference to "low gross profit margin on sales" is the standard in the indus-

try. As to any "disadvantage in location as compared to other major competitors," Clavin cites comparably low shipping costs and a local monopoly on sales of distilled spirits to bottlers and wholesalers as indicative of a major advantage in location.

By settlement agreement dated September 5, 1984, Barclays withdrew its motion to convert. That agreement provided in relevant part for an apparently accelerated payment schedule by which the $630,000 plus interest owed Barclays, in addition to Barclays' reasonable expenses and attorneys' fees, would be paid in full by December 15, 1984. Mr. Clavin indicates in his affidavit that as of November 2, 1984, the Debtor's loan balance to Barclays was $105,000. He estimates that Barclays will have been completely repaid by approximately November 16, 1984.

## DISCUSSION

A secured creditor's right to payment of attorneys' fees and expenses out of the bankrupt estate is governed by 11 U.S.C. § 506(b).[3] That section allows reasonable fees and expenses to the extent that the value of the secured property, less any recovery by the trustee pursuant to 11 U.S.C. § 506(c),[4] exceeds the amount of the secured claim, if such fees and expenses are provided for under the agreement giving rise to the secured claim. In this case the facts clearly establish that the parties' loan agreement and court-approved stipulations provide for reasonable attorneys' fees and expenses. The only issue remaining to be decided is whether the fees and expenses sought by Barclays were reasonable.

■ As to the reasonableness of attorneys' fees and expenses under section 506(b), the ultimate burden of persuasion is on the secured creditor seeking payment. *See Matter of Kennedy Mortgage Co.*, 23 B.R. 466 (Bktcy.D.N.J.1982) (secured creditor's failure to provide documentation pursuant to former Bankruptcy Rule 219(a) (currently Bankruptcy Rule 2016) held to preclude award of fees); *In re H.P. Tool Manufacturing Corp.*, 12 B.R. 600 (Bktcy.E.D.Pa.1981) (absent evidence of reasonableness of fees as required by former Bankruptcy Rule 219(a), award of fees pursuant to section 506(d) not possible). *Cf. Matter of DeLorean Motor Co.*, 39 B.R. 157 (Bktcy.E.D.Mich.1984) (burden of persuasion on claimant once claim objector meets burden of going forward with evidence sufficient to rebut claimant's proof of claim); *In re WHET, Inc.*, 33 B.R. 424 (Bktcy.D.Mass.1983) (burden of proof as opposed to burden of going forward with evidence is always on claimant).[5] Conse-

3. Section 506(b) provides in full:
 To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs or charges provided under the agreement under which such claim arose.
 11 U.S.C. § 506(b) (1982).

4. Section 506(c) provides:
 The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
 11 U.S.C. § 506(c) (1982). As this case is currently governed by chapter 11 of the Bankruptcy Code, no trustee has been appointed pursuant to 11 U.S.C. §§ 1103 or 1104, and there is no suggestion that the Debtor, as debtor-in-possession, has incurred costs or expenses of this nature, section 506(c) is not herein applicable.

5. While I am aware of no decision which explicitly and fully addresses the question of the burden of proof under section 506(b), I see no reason to treat a secured creditor's right to fees and expenses any differently than an officer's right to compensation pursuant to 11 U.S.C. § 330. The decisions are unanimous in holding that, as to a fee application under section 330, the party seeking compensation from the estate bears the burden of proof. *See, e.g., Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1207 (5th Cir. 1981); *In re Coastal Equities, Inc.*, 39 B.R. 304, 310 (Bktcy.S.D.Cal.1984); *In re Werth*, 32 B.R. 442, 444 (Bktcy.D.Colo.1983); *Matter of Liberal Market, Inc.*, 24 B.R. 653, 657 (Bktcy.S.D.Ohio 1982); *Matter of Olen*, 15 B.R. 750, 752–53 (Bktcy.E.D.Mich.1981); *In re Underground Utilities Construction Co.*, 13 B.R. 735, 737 (Bktcy.S. D.Fla.1981). As a secured creditor's fees and expenses are included as a portion of the secured claim under section 506(b) and are essentially paid out of estate assets which would normally otherwise be consumed in distribution

quently, Barclays has the burden of demonstrating upon a preponderance of the evidence that the fees and expenses objected to by the Debtor are reasonable.

 In this case the Debtor objects primarily to the attorneys' fees and expenses associated with Barclays' motion to convert. Specifically, the Debtor requests this Court to issue an order determining that Barclays is not entitled to at least the following fees and expenses:

(a) attorneys' fees in the amount of $12,263.31 incurred from August 1, 1984 to September 7, 1984;

(b) cash disbursements in the amount of $2,952.67 expended from August 10, 1984 to September 5, 1984;

(c) management consultant fees totaling $4,004.22;

(d) equipment appraisal fees totaling $2,129.13; and

(e) real estate appraisal fees totaling $4,500.00.

As grounds for its objection, the Debtor contends that it was commercially unreasonable for Barclays to so aggressively attempt to satisfy its loan balance when it was significantly oversecured such that its interests were fully and completely protected. In fact, the Debtor argues:

> With a gap larger than $300,000 between its debt and the amount of its security, Barclays reasonably could not have been worried about being repaid. Thus, the only conceivable goal that it might have had was, contrary to the rights given to

Minnesota Distillers under the bankruptcy laws, to force Minnesota Distillers to repay its debt immediately. Barclays' efforts to accomplish this result cost over $47,000.

Debtor's Responsive Brief at 4. I find, however, that there was reasonable concern as to the extent of Barclays' secured status. Moreover, I am not persuaded that a secured creditor's interest in immediate repayment of a debt is necessarily contrary to the Debtor's statutory rights under the Bankruptcy Code.

The standard of reasonableness to be applied pursuant to section 506(b) is that of "commercial reasonableness." *In re Hart Ski Manufacturing Co., Inc.,* 9 B.R. 397, 400 (Bktcy.D.Minn.1981). While Barclays attempts to draw a distinction between whether the fees are reasonable in amount and whether the services rendered are properly chargeable to the parties' loan agreement, I find the distinction immaterial. It is true that the *Hart Ski* opinion addressed only the reasonableness of the fee and expense amounts, focusing primarily on the reasonableness of the applicant's billing rates. It does not necessarily follow, however, that Judge Dim's decision in that case should therefore be construed to allow wholly unnecessary fees which are billed out at reasonable rates. The standard of "commercial unreasonableness" may well incorporate as one of its factors the concept that a secured creditor may not be compensated for services which are in themselves unreasonable and unnecessary.[6]

---

to other creditors, the secured creditor has little, if any, interest in the actual amount of such fees and expenses. Placing the burden of proof on the secured creditor seeking compensation serves as an effective tool in protecting the interests of other creditors. *Cf. Matter of Olen, supra,* at 752 (discussing need for judicial scrutiny of debtor's attorney's fees).

Bankruptcy Rule 2016, which sets out the procedure under which an applicant may seek compensation pursuant to 11 U.S.C. §§ 326–31, inherently supports placing the burden of proof on the party seeking compensation. While its predecessor rule, Rule 219(a), has been held to apply to fee and expense requests under section 506(b) as well, *see, e.g., Matter of Kennedy Mortgage Co.,* 23 B.R. 466, 473 (Bktcy.D.N.J.1982), it

is unnecessary for me to decide that question at this time. It is clear, however, that a secured creditor must produce as evidence adequate documentation of its fees and expenses before it can prevail against opposing objections. Generally to attach to such documentation any greater significance than merely the establishment of a prima facie case, though, would be a mistake.

**6.** In *Matter of Scarboro & Garnto,* 4 C.B.C.2d 1222 (M.D.Ga.1981), the court listed the following factors as applicable under section 506(b): (a) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the

Barclays correctly argues, however, that even if unreasonable services may not justify reimbursement under section 506(b), it services and expenses in this case were commercially reasonable. Contrary to assertions in the Debtor's memoranda, the affidavit submitted by Barclays indicates that there was considerable confusion as to the true value of the collateral securing the loan. While the July 3 cash collateral order indicated that Barclays was oversecured in the amount of $666,691.89, the Debtor fails to recognize that the district court's valuation of the collateral in that order reflects only the evidence submitted at the hearing and generally has no res judicata or collateral estoppel effect upon subsequent hearings. *See In re Vacuum Cleaner Corp. of America*, 33 B.R. 701, 703–5 (Bktcy.E.D.Pa.1983); *Fairchild v. Lebanon Production Credit Association*, 31 B.R. 789 (Bktcy.S.D.Ohio 1983).[7]

Moreover, it is clear that the appraisals contracted for by Barclays were not merely cumulative of valuations previously determined at the cash collateral hearing. In fact, the appraisals of equipment and real estate indicated a combined fair market value of $902,700, reflecting a $457,300 reduction in value since the cash collateral order. If accepted by the court during the conversion hearing, these new values would have revealed that Barclays had entirely lost, in its second secured position, any interest whatsoever in that collateral. While I render no opinion as to the possibility that Barclays would have been successful on the merits, it is clear that such valuations were relevant to a showing of diminution of the Debtor's estate in a hearing on conversion.

As to the management report which both Mr. Clavin and the Debtor's counsel insist points out the obvious, there is no doubt that it could have been useful and relevant at a hearing on conversion. Whether or not the report contained few surprises, Barclays would still have been constrained to enter such facts into the record at the hearing. Absent any stipulation between the parties, expert testimony grounded in appropriate foundation may have been essential. Consequently, the mere assertion that the conclusions rendered were often obvious is irrelevant to whether there was a need for the report at all. Furthermore, the Debtor's claim that the report contains inaccuracies demonstrates little more than that there was a difference of opinion between the parties.

The Debtor's final assertion is that the fees and expenses incurred in furtherance of the conversion motion were unreasonable in that it was unreasonable for Barclays to move for conversion in the first place. As a basis for this assertion, the Debtor argues that Barclays was never in danger of losing its fully secured position and therefore did not need to take further legal action to protect itself. As already indicated, however, the full extent of Barclays' secured position was uncertain.

---

fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases. *Id.* at 1227. *See also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977). As intimated by Barclays, where the services rendered are wholly unnecessary to protect the secured creditor's interests, it may well be that the first factor has not been met in that no time or labor was required. *See In re Continental Vending Machine Corp.*, 543

F.2d 986, 994 (2d Cir.1976) (indication that secured creditor would not be entitled to reimbursement for unnecessary services).

**7.** As in *In re Vacuum Cleaner Corp. of America*, the facts in this case distinguish it from those in the case of *In re Bohrer*, 19 B.R. 958 (Bktcy.E.D. Pa.1982). In *Bohrer*, the court held that a debtor was collaterally estopped from relitigating the value of property in a second lien avoidance hearing when the value of such property had been determined only the day before in the first hearing. In this case, however, the question of property valuation arose with respect to different legal issues—cash collateral and conversion—and the hearing dates were further apart.

While the Debtor points to a November 2 loan balance of only \$105,000 in addition to the asserted probability that Barclays would be completely repaid by November 16, these factors only serve to demonstrate the value of hindsight. Had this information been available to Barclays three or four months ago, it may be that it would not have assumed such an aggressive stance.

To the extent that Barclays' goal might simply have been to receive immediate repayment from the Debtor, I do not agree that such is in itself contrary to rights given the Debtor under the Bankruptcy Code. Certainly, one of the effects of conversion is to force a rapid liquidation of the bankrupt estate and speedy distribution to the creditors. Thus, where conversion is appropriate the goal of immediate repayment is in harmony with a debtor's statutory rights. Where the parties settle prior to the conversion hearing such that a significant secured creditor receives the substantial equivalent of immediate repayment, there is a strong inference that the debtor considered conversion a likely result should the hearing go forward. In this case, Barclays received a favorable repayment provision in the parties' settlement agreement in exchange for no longer pursuing the Debtor's conversion. Absent any greater showing by the Debtor, I must conclude that it entered into the settlement agreement at least partially because a judicial resolution on the merits was deemed a less favorable alternative.

IT IS THEREFORE HEREBY ORDERED that Barclays has sustained its burden of proof in demonstrating the reasonableness of its actions in pursuing its motion to convert the Debtor. The Debtor's objection to Barclays' fees and expenses is denied.[8]

---

8. Barclays correctly points out that as of yet no claim has been filed concerning the objected-to fees and expenses, thereby suggesting that the Debtor's objection was not timely made. As I am ruling in favor of Barclays on the Debtor's objection, I will not herein address the timeliness issue. This Order should not, however, be interpreted as exempting Barclays from any obligation it might have to file such claim.